United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA ALLIANCE OF CHILD AND FAMILY SERVICES, | No. C 09-4398 MHP |
| Plaintiff, | **MEMORANDUM & ORDER** |
| v. | **Re: Plaintiff's Motion for a Preliminary Injunction** |
| JOHN WAGNER, Director of the California Department of Social Services, in his official capacity; GREGORY ROSE, Deputy Director of the Children and Family Services Division of the California Department of Social Services, in his official capacity, | |
| Defendants. / | |

Plaintiff represents the interests of certain agencies that operate group homes in California. These group homes provide care and supervision for foster children with emotional or behavioral problems who cannot live safely in their own homes or another family setting. Defendants administer the State of California's contributions to the funding to such group homes. Plaintiff has brought this action seeking to enjoin defendants from implementing a ten percent reduction to the funding of group homes adopted by the California legislature as part of the Budget Act of 2009. Plaintiff alleges, pursuant to 42 U.S.C. section 1983 ("section 1983"), that the reduction causes the State's funding scheme to fall out of substantial compliance with the federal Child Welfare Act, 42 U.S.C. §§ 670-79b. Now before the court is plaintiff's motion for a preliminary injunction.

Having considered the parties' submissions and arguments, the court enters the following memorandum and order.

BACKGROUND

I.  Parties

The California Alliance of Child and Family Services ("the Alliance" or "plaintiff") is a non-profit organization whose member agencies operate eighty-seven group home programs with a collective licensed capacity of 3,720 beds. Docket No. 11 (Johnson Dec.) ¶ 2. The California Department of Social Services ("CDSS") licenses, audits and provides funding to these group homes through the "Aid to Families with Dependent Children–Foster Care" ("AFDC-FC") program. Cal. Health & Safety Code §§ 1500; Cal. Welf. & Inst. Code §§ 11450(d) & 15200(c)(1). Plaintiff's members receive "foster care maintenance payments" pursuant to the Child Welfare Act. Defendants John Wagner and Gregory Rose are senior officials of the CDSS, sued in their official capacity. They are referred to collectively herein as "the State" or "defendant."

II. The Child Welfare Act

The federal Child Welfare Act ("CWA" or "the Act") establishes a cooperative federal-state program that assists states in meeting the costs of providing foster care to children. Pursuant to this federal spending clause legislation, the federal government and the state governments share the cost of providing funds for licensed third parties (e.g., group homes) that care for these children. The CWA and related federal regulations require states receiving federal aid to provide foster care for a child when a court has determined that it is necessary under applicable law that the child be removed from his or her home and placed in out-of-home care. *See, e.g.*, 42 U.S.C. §§ 670-79b.

The CWA requires that states participating in the cooperative program provide "foster care maintenance payments" on behalf of eligible children to child-care institutions, including group homes. 42 U.S.C. §§ 671(a)(1), 672(b)(2); 45 C.F.R. § 1356.21(a). "The term 'foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance

2

with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. § 675(4)(a). "In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence." *Id.*

To become eligible for federal funding, a state must submit a plan for financial assistance to the U.S. Secretary of Health and Human Services ("the Secretary") for approval. As a prerequisite for approval, the submitting state must agree, among other conditions, to administer its foster care program pursuant to the CWA, related regulations and policies promulgated by the Secretary. *Id.* § 671(a), (b); 45 C.F.R. §§ 233.110, 1355.21, 1356.20, 1356.21. Pursuant to the CWA, a state must designate a state agency to administer or supervise the administration of the approved state plan. 42 U.S.C. § 671(a)(2). The state must also amend its approved plan by appropriate submission to the Secretary whenever necessary to comply with alterations to the CWA or federal regulations or policies. 45 C.F.R. § 1356.20(e)(1).

III. California Law and the Rate Classification Level (RCL) System

For all relevant periods, the CDSS has been the state agency responsible for submitting the California state plan to the Secretary for approval. *See* Cal. Welf. & Inst. Code § 11460(a). Subsequent to approval, the CDSS receives federal funding intended to cover a portion of the foster care maintenance payments made to group homes on behalf of eligible children.[1] *See generally id.* § 11462. California law provides: "Foster care providers shall be paid a per child per month rate in return for the care and supervision of the AFDC-FC child placed with them." *Id.* § 11460(a). "Care and supervision" is defined as "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." *Id.* § 11460(b). This language largely mirrors the language of the CWA, showing that CDSS took the statutory criteria mandated by the CWA into account in developing its system to provide foster care maintenance payments. *See* Mar. 2008 Order at 6.

3

CDSS uses a Rate Classification Level ("RCL") system to establish payment rates for foster care group home programs. *See generally* Cal. Welf. & Inst. Code § 11462. The RCL system was implemented during the 1990-91 fiscal year, and it has never been rejected by the Secretary. The CDSS, through the Children and Family Services Division, assigns group home programs to one of fourteen levels (i.e., RCLs). All group home programs with the same RCL receive the same payment rate per child based on the standardized schedule of rates set forth in state law. *See* Docket No. 41 (Williams Dec.), Exh. A. For instance, in 2008-09 a group home in RCL 6 received foster care maintenance payments of $3,489 per child per month, whereas a group home in RCL 12 received payments of $6,694 per child per month. *Id.* ¶ 7.

The assignment of an RCL to a particular group home is based upon the measure of "points" earned by the home, such measure indicating the intensity of care and services the home provides. Points are assigned by determining the total number of hours worked by staff, with certain adjustments, and dividing those hours by a measure of the number of children in the home.[2] The staff hours are adjusted by taking into account the experience, education and ongoing training of each staff member. For instance, the value of an hour of child care and supervision provided by an individual with no college degree, no prior experience and no program-provided training would be 1.0, whereas the value of an hour of child care and supervision provided by an individual with 48 months of experience, a bachelor's degree in behavioral science, and participation in program-provided training would be 1.6. *See id.*, Exh A. at 1. The number of points earned by a group home determines the applicable RCL level, which in turn determines the amount of money paid per child under the state's program; the "points" are therefore a function of the services provided to the children on a per child basis.

The initial standardized schedule of foster care rates for the 1990-91 fiscal year was developed using 1985 calendar year costs. This schedule was to be increased each fiscal year in tandem with the California Necessities Index ("CNI"). Cal. Welf. & Inst. Code §§11453. The CNI is a weighted average of increases in various necessary costs of living for low-income consumers, including food, clothing, fuel, utilities, rent, and transportation. *Id.* State law allows the CNI

4

increase to be circumvented in certain situations: "Beginning with the 2000-01 fiscal year, the standardized schedule of rates shall be adjusted annually by an amount equal to the CNI computed pursuant to section 11453, *subject to the availability of funds.*" *Id.* § 11462(g)(2) (emphasis added).

IV.     *California Alliance I*

On June 30, 2006, the Alliance filed a section 1983 action in this court alleging that the funding level for foster care maintenance payments paid to group homes pursuant to the RCL system had deviated from actual costs to such an extent that the State's scheme no longer complied with the CWA. *See* Case No. C 06-4095 (N.D. Cal.) (Patel, J.) *(California Alliance I)*. Since the 1990-91 fiscal year, the State had increased rates established under the RCL system by approximately 27%, whereas the CNI had increased by approximately 59%. *See California Alliance I*, Docket No. 41 (Joint Statement of Undisputed Facts). The court ruled that the CWA confers an individual right on plaintiff's members to enforce foster care maintenance payments pursuant to 42 U.S.C. section 675(4)(a). *California Alliance I*, Docket No. 24 (Oct. 2006 Order). Thereafter, the court ruled on cross-motions for summary judgment. The court found that, as of the 2006-07 fiscal year, the RCL system provided for "at least 80% of the costs associated with the items enumerated in the CWA." *California Alliance I*, Docket No. 57 (Mar. 2008 Order) at 7. The court ruled that the State was obligated only to substantially—rather than fully—comply with the CWA, and that the level of funding at that time was enough to enable a finding of "substantial compliance." The court summarized its rulings as follows:

> In sum, with respect to institutional providers, the State's methodology in determining foster care payments must consider the costs of the items enumerated in the federal statute. *See* 42 U.S.C. § 675(4)(a). The methodology must also consider the reasonable costs of the administration and operation of such institutions. *Id.* In addition, the State may account for budgetary considerations as long as payment levels remain in substantial compliance with the costs to be incurred. Since the California scheme takes the appropriate statutory considerations into account and is in substantial compliance with the CWA, federal law has not been violated.

*Id.* at 8. The court warned "Nevertheless, it is worth repeating that without further increases over time, the California system may well be in violation of federal law." *Id.*

5

V.  Subsequent Developments

Effective January 1, 2008, the California legislature increased the amount included in the standard rate for each RCL by five percent. *See* Cal. Welf. & Inst. Code § 11462(g)(4). According to the State, at that point the rates represented 83.81% of the costs of the program. Williams Dec. ¶ 7. In July 2009, the California legislature, sitting in its fourth extraordinary session of the year, approved Assembly Bill ABX4 4, which among other things reduced the standard rate for each RCL by ten percent, effective October 1, 2009. This legislation was signed by the Governor Schwarzenegger on July 28, 2009, and codified at California Welfare and Institutions Code section 11462(g)(5). *See* ABX4 4 § 21, *available at* http://www.leginfo.ca.gov/bilinfo.html (last visited Nov. 13, 2009). In the meantime, cost of living increases for the years following those addressed in the *Alliance I* decision, as measured by the CNI, have been: 3.7% (2007-08), 5.26% (2008-09), and 1.53% (2009-10). Williams Dec. ¶ 8. The State has made no adjustments to offset the increased cost of living aside from the five percent increase that had been enacted effective January 1, 2008. In light of the ten percent reduction provided in the Budget Act of 2009 and unmet increases in the CNI, the State concedes that the RCL rates for 2009-10 represent only 69.63% of the costs of the group home programs. *Id.*

On October 11, 2009, the governor signed Senate Bill 597 ("SB 597") into law. This legislation adopted a set of adjusted point ranges to be used to calculate RCLs during the 2009-10 fiscal year. *See* SB 597 § 5, *available at* http://www.leginfo.ca.gov/bilinfo.html (last visited Nov. 13, 2009). The range of points serving to qualify a group home to receive payments at a particular RCL was decreased for each RCL. For instance, a group home was required in 2008-09 to provide services within the point range of 282-310 to be eligible for payments at RCL 10. Under SB 597, a home is eligible for payments at RCL 10 if it provides services in the 245-270 point range. *See id.*

VI.  Federal Eligibility

According to the State, approximately 41% of children in group homes—3,924 out of 9,585 children—are not "federally eligible," and the State receives no federal payments for these children. *See* Docket No. 52 (Habek Dec.) ¶ 3. Conversely, approximately 5,683 children are federally

6

eligible and subject to the CWA.[3] *Id.* The Alliance agreed at oral argument that some children in group homes are federally eligible and subject to the CWA while some are not.

VII. Procedural History

Plaintiff filed this action on September 18, 2009. The complaint was accompanied by an ex parte application for a Temporary Restraining Order (TRO). The parties appeared on October 9 and 29 to argue the merits of granting a TRO. Following additional submissions requested by the court and filed by the State on November 2, the court entered, on November 4, a TRO and order to show cause why a preliminary injunction should not issue. Plaintiff filed and served its motion for a preliminary injunction that same day. The court invited the parties to call witnesses at oral argument, held November 13, 2009, and both parties declined to do so.

LEGAL STANDARD

A preliminary injunction is a provisional remedy, the purpose of which is to preserve status quo and to prevent irreparable loss of rights prior to final disposition of the litigation. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). In light of these considerations, a plaintiff seeking preliminary injunctive relief must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits [have been] raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir. 2003) (en banc) (per curiam). The district court must also consider whether the public interest favors issuance of a preliminary injunction. *Id.* The components of these two tests operate on a sliding scale or "continuum." *Id.* at 918. Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Id.*; *see also Miller v. California Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994) (en banc).

DISCUSSION

I.      Likelihood of Success on the Merits

     A.      Substantial Compliance

In *California Alliance I*, this court cautioned that the RCL system may no longer substantially comply with the provisions of the CWA should the level of funding drop yet further. At that time, the RCL system provided for at least 80% of the costs of the items set out in the CWA. In light of the ten percent reduction for 2009-10 and the absence of increases reflecting the CNI, the State concedes that the RCL rates for 2009-10 represent only 69.63% of costs. Williams Dec. ¶ 8. The Alliance argues that it is likely to succeed on the merits of its claim that 69.63 cents on the dollar does not represent substantial compliance with the requirements of the CWA, which requires that the State "cover the costs" of the items enumerated in 42 U.S.C. section 675(4)(a). Where full compliance with the CWA's mandate to "cover the costs" for foster children would entail the payment of one dollar in foster care maintenance payments for every dollar of actual cost, the court views it as likely that plaintiff will succeed in showing that payment of less than 70 cents on the dollar does not constitute substantial compliance. A foster child who scores a 69.63% on an English exam would typically receive a grade of "F." The State has advanced no argument explaining why it should be held to a lower standard in its compliance with federal law.

     B.      Federal Preemption and Judicial Review

The State advances several arguments why this court should not issue a preliminary injunction. First, the State challenges the premise that the CWA can preempt the challenged budget provision under the Supremacy Clause of the United States Constitution.[4] In determining whether a federal law preempts a state law, it is necessary to look to the purpose of Congress as a touchstone and to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, ___ U.S. ___, ___, 129 S.Ct. 1187, 1194-95 (2009). A state statute may be preempted expressly or impliedly; implied preemption may be found where it is "impossible for a private party to comply with both state and federal requirements" or where state law "stands as an obstacle to the

8

accomplishment and execution of the full purposes and objectives of Congress." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64-65 (2002) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).  The State asserts, offering little rationale, that the ten percent reduction is entirely consistent with the CWA's provisions addressing foster care maintenance payments and therefore does not conflict with the Act.  Notably, the State's argument does not address the actual language of the CWA, which requires the State to "cover the costs" of providing the items enumerated in the Act.  A purpose of the CWA is to cover the costs of those items for foster children.  *See* 42 U.S.C. § 670.  Insofar as it is likely the ten percent reduction results in payments that fail to "cover the costs," the budget provision frustrates Congress's unambiguous purpose.  The court finds that the Alliance is likely to prevail on the preemption issue.

The State also argues that the court cannot determine whether the State is in substantial conformity with the CWA, because the Secretary is authorized to determine substantial conformity.[5] The federal statute 42 U.S.C. section 1320a-2a (a) provides that the Secretary "shall promulgate regulations for the review of [foster care] programs to determine whether such program are in substantial conformity with [federal requirements and regulations, and the approved State plan]." That provision sets out specific elements for review of substantial compliance.  *See id.* § 1320a-2a (b) & (c).  It is undisputed that the Secretary can find a State's program not to substantially comply with the mandates of the CWA.  Yet the State does not point to any statute, and the court is aware of none, limiting judicial review over the question of substantial compliance.  This court held the existence of agency approval not to be dispositive in *California Alliance I*.  *See California Alliance I*, Mar. 2008 Order at 5.  The other cases addressing foster care maintenance payments have likewise held judicial review not to be foreclosed.  *See Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032 (W.D. Mo. 2003); *California Foster Parent Ass'n v. Wagner*, 2008 WL 4679857 (N.D. Cal. Oct. 21, 2008) (Alsup, J.).

C.   Effect of SB 597

The only substantive argument advanced by the State is the contention that SB 597 somehow offsets the effects of funding foster care maintenance payments at 69.63% of actual costs.  The court

9

noted in its TRO that this argument appeared to have little merit, and the State has submitted no evidence suggesting a contrary conclusion. As noted, the "points" a group home receives directly correlate to the hours and expertise of staff care provided for each child. The adjustment of the point scale provided in SB 597 appears to help a group home's financial posture by allowing the group home to cut "costs," i.e., the services provided to each child, without losing additional funding. By cutting the points necessary to achieve a certain RCL level, SB 597 increases the nominal percentage of costs covered by foster care maintenance payments by allowing homes to provide less care and supervision services. *See, e.g.*, Williams Dec. ¶ 9 ("Under this system . . . [a]n RCL 11 [group home] can operate at the adjusted (lower) point schedule, equivalent to an RCL 9, while still being paid at an RCL 11. Thus, the group home is operating at an RLC 9 and being paid 81.70 percent of its costs."). The concern of the Act is the actual provision of foster care to children, not simply the balance sheets of the service provider. While SB 597's adjustment of point ranges may reduce the group home's overhead, it does not appear to blunt the impact of the budget reduction upon the foster children in group homes.

If anything, the readjustment of points raises troubling questions about the State's commitment to care for the most troubled foster children. The State calculates points on an absolute basis: the level of care and supervision per child meriting 300 points this year is the same, or approximately the same, as the level meriting 300 points last year. *See* Williams Dec. It is the point requirements for each RCL that have shifted. Last year, 300 points would place a home in RCL 10; under the current budget, it would compensate the home at an RCL 12 level. *See* SB 597 § 5. The highest RCL level is RCL 14. Last year, a home could achieve RCL 14 by providing services worth 396 points; under the current budget, a home need only provide services worth 348 points to achieve the highest level of funding. This begs the question: what happens to the children with the greatest learning disabilities and behavior problems, who need care at the 396-point intensity? Either the group homes providing such care will scale back, in order to reap the savings of SB 597, or they will continue to provide 396-point service, nullifying any benefit to be derived from the point adjustment.

10

In summary, the State's argument that SB 597 somehow offsets the effects of the ten percent budget reduction appears flawed.

II.     Balance of Hardships and the Public Interest

The State argues that the Alliance has not shown a possibility of irreparable injury or that the balance of hardships tips in its favor. According to the State, "plaintiff has yet to offer *any* evidence that *any* foster child has gone without services." Docket No. 51 (Def.'s Opp.) at 9. Plaintiff has provided declarations of agency representatives who testify that the failure of foster care maintenance payments to track increases in the cost of living has caused some homes to close. *See, e.g.*, Docket No. 9 (Di Stefano Dec.); Docket No. 10 (Diamond Dec.); Docket No. 14 (Martone Dec.). This evidence, standing alone, is unpersuasive. There may be any number of factors, such as an increased policy preference for placing children in private homes, that may account for the closing of group homes. *See* Docket No. 27 (Treadwell Dec.) (describing decline of numbers of children in group homes occurring in tandem with an increase in children participating in California's "Wraparound" program). Moreover, the purposes of the CWA include providing for foster children, not ensuring that any particular program or given home remains open.

Yet plaintiff has also provided declarations of agency representatives testifying to the consequences to the children in their homes of the State's failure to meet its obligations under the CWA. *See, e.g.*, Docket No. 12 (Lemieux Dec.) ¶ 8 ("Because of the past failure to make cost-of-living adjustments to reimbursement rates and the recently instituted ten-percent reduction in reimbursement rates, we cannot afford to hire the additional staff we need. Specifically, we need, but cannot afford to hire, one therapist, three full-time child care workers and one full-time administration/office position. We are also unable to afford additional hours by our psychiatrist."); Docket No. 13 (Martin Dec.) ("[T]he reimbursement rates from DSS no longer cover the costs of providing the required basic necessities to the foster care children at our facilities. Unfortunately, this has led us to lay-off some of our staff."); Docket No. 15 (Rich Dec.) ("The majority of our residents have some form of learning disability and there are currently at least twenty-five girls at our facility who would benefit from participation in the [special program for children with learning

11

1 disabilities]. Unfortunately, because of inadequate funding, only three girls are currently
2 participating and no new residents will be accepted into the program. We now only accept private
3 clients who can afford to pay for their cost of participation in the program."). The declarants are
4 advocates for their programs, rather than unbiased commentators, and they undoubtedly have a
5 vested interest in the institutions they represent. Regardless, it is incorrect to assert that the Alliance
6 has provided no evidence that the State's failure to meet its funding obligation is likely to harm
7 children.

8 Indeed, the ten percent reduction contemplated by the Budget Act of 2009 could not but have
9 an effect upon the services provided to foster children. The RCL payments are calculated on a per
10 child per month basis, not a per home basis. *See* Cal. Welf. & Inst. Code § 11460(a). Accordingly,
11 the cut does not reflect, for instance, a determination that each group home has seen a recent ten
12 percent decrease in the number of children it services, in which case the resources per child would
13 remain constant despite a ten percent cut. There is no evidence that the reduction has any relation
14 whatsoever to the number of children in any group home: the group homes were presumably caring
15 for approximately as many children on October 1 as on September 30—but with ten percent less
16 money from foster care maintenance payments. There is no evidence that the legislature enacted the
17 ten percent reduction based on a finding that the earlier funding level provided luxuries or non-
18 essential items to foster children.[6] The RCL levels initially established for the baseline year of 1990-
19 91 were based upon data reporting actual costs and staffing levels. *California Alliance I*, Mar. 2008
20 Order at 6; *see also* Cal. Welf. & Inst. Code § 11462(c). The premise of the State's RCL scheme is
21 that these actual costs increase according to annual increases in the CNI. Accordingly, it is very
22 likely that the actual costs that are supposed to be paid under the RCL system, as adjusted according
23 to the CNI, actually represent the costs of maintaining a foster child. By the logic of the State's
24 funding structure, there can be little doubt that the ten percent cut directly affects the services
25 provided to foster children. The State suggests that a preliminary injunction should not issue until
26 actual instances of child neglect or deprivation of food, shelter or other enumerated items to specific
27 children have been documented. Such an approach would not reflect the appropriate standard for a
28

12

1 preliminary injunction, which is to prevent irreparable harm before a trial can be held on the merits,
2 and it would undermine the very purposes of the CWA.

3 It is true that the State is in the midst of a severe budgetary crisis. As of October, the State of
4 California had a negative cash balance of $16.2 billion, which was being covered by $7.4 billion in
5 internal borrowing and $8.8 billion in external borrowing. Docket No. 36 (Def.'s RJN) ¶ 3. The
6 state legislature has been forced to enact cuts to numerous state programs to narrow California's
7 budget shortfall.[7] Yet the State has consistently underfunded the RCL system, in good times as well
8 as bad. There was no global financial crisis two years ago, when the State funded only 80 cents on
9 the dollar, or in the several years previous, when payments under the RCL system slipped further
10 and further below the actual costs of the items enumerated in the CWA. Had the State complied
11 more fully in better times, a sudden ten percent reduction might not have imperiled its substantial
12 compliance with the statute. California has opted into the CWA's statutory scheme and cannot
13 simply ignore the requirements of federal law.

14 On the other side of the balance stand the basic needs of thousands of foster children. The
15 implementation of the ten percent funding reduction may be expected to result in reductions in care,
16 housing, services, staffing numbers and staff qualifications. The resources provided to cover food,
17 clothing, shelter, daily supervision and the other items enumerated under the CWA would decline
18 substantially from a level that was already underfunded according to the State's own funding
19 scheme. Additionally, group homes that begin to restructure their respective staffing complements
20 in response to the reduction may find it difficult to reestablish the *status quo ante* should plaintiff
21 succeed on the merits. Plaintiff has demonstrated that the balance of hardships tips sharply in its
22 favor. *See Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1126
23 (9th Cir. 2008) ("While the City's and Association's injuries are entirely economic, the Intervenors'
24 injuries include preventable human suffering. Therefore, the balance of hardships tips sharply in
25 favor of the parties seeking relief."). Moreover, the public interest weighs in favor of ensuring that
26 decisions directly affecting this particularly vulnerable segment of society scrupulously adhere to the
27 law's requirements. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (holding public

28

13

1 interest more harmed by possibility of wrongful deprivation of benefits to vulnerable persons than
2 by possibility that government might not recoup funds it need not have paid).

CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED. Pending final adjudication of the merits of the instant action, named defendants John Wagner and Gregory Rose, and their successors, agents, officers, servants, employees, attorneys and representatives, and all persons acting in concert or participating with defendants in their respective official capacities as Director of the California Department of Social Services and Deputy Director of the Children and Family Services Division of the California Department of Social Services, are HEREBY ENJOINED AND PROHIBITED from implementing the ten percent reduction in the standardized schedule of rates for each RCL provided at California Welfare and Institutions Code § 11462(g)(5), such reduction having been approved in Assembly Bill ABX 4 4, filed with the Secretary of State on July 28, 2009, and Senate Bill 597, filed with the Secretary of State on October 11, 2009, as part of the Budget Act of 2009.

This injunction prohibits implementation of the reduction only with respect to payments made in connection with children subject to the CWA. Execution of the injunction SHALL NOT be carried out in a manner that will reduce in any amount the full entitlement to such federally eligible children under this order.

Counsel for the parties agreed at oral argument that the RCL system and group homes do not distinguish between federally eligible and non-federally eligible children in the rates set or the services provided. This raises the question whether any funding scheme for foster care maintenance payments that discriminates among federally eligible and non-federally eligible children can be carried out under California's system. To ensure compliance with this injunction, the State SHALL file within twenty-one (21) days of entry of this order the State's plan for determining the amount of foster care maintenance payments for each group home that will satisfy this order.

14

The parties SHALL address the issue of retroactivity and the limited question of substantial compliance in accordance with the briefing schedule set out at oral argument.

IT IS SO ORDERED.

Dated: November 17, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

15

# **ENDNOTES**

1.   By way of example, the standard rate for a single child in an RCL 12 group home was $5,891 during the 2008-09 fiscal year. The "federally allowable" portion of the cost—i.e., the portion that covers costs included in the CWA's definition of "foster care maintenance payments"—was $5,377. The federal government pays 50% of this $5,377, while the particular county pays 30% and the State pays 20%. Docket No. 31 (Johnson Supp. Dec.) ¶ 6. When the State reduces its contribution by 10%, the federal government and county also reduce their contributions by approximately the same amount; therefore, a 10% percent reduction in the State's contribution results in an approximately 10% reduction in the overall rate paid. *See id.* ¶¶ 7-9.

2.   Specifically, the adjusted hours are divided by the greater of 90% of the program's licensed capacity or 5.4 minimum occupancy for group homes that have six children. Williams Dec., Exh. A at 1.

3.   The State's numbers do not add up: 5,683 plus 3,924 equals 9,607, not 9,585.

4.   This court held in *California Alliance I* that the Alliance has a private right of action under section 1983 to enforce the provisions of the CWA at issue. *California Alliance I*, Oct. 2006 Order. Two other federal district court cases have held that a private plaintiff can maintain a right of action under section 1983 to enforce CWA provisions pertaining to reimbursement of foster care maintenance costs. *See Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032 (W.D. Mo. 2003) (holding CWA created right enforceable by foster care institutional providers pursuant to section 1983); *California Foster Parent Ass'n v. Wagner*, 2008 WL 4679857 (N.D. Cal. Oct. 21, 2008) (Alsup, J.) (holding same as to foster parents receiving foster care maintenance funding for the support of children living in private homes).

5.   The State also argues in its opposition papers that the Alliance has failed to provide evidence that its members serve children who are federally eligible. Yet the Alliance has provided several declarations attesting to the fact that Alliance members receive foster care maintenance payments pursuant to the CWA. *See, e.g.*, Docket No. 11 (Johnson Dec.) ¶ 5; Docket No. 12 (Lemieux Dec.) ¶¶ 4-5; Docket No. 15 (Rich Dec.) ¶¶ 4-5. Counsel for the Alliance also stated in open court that the Alliance's breakdown of federally eligible versus non-federally eligible children is roughly equivalent to that in the State's total population of foster children living in group homes.

6.   Counsel for the State speculated at oral argument that some children may be admitted to group homes providing a higher level of care than they need. Counsel conceded, however, that the State has provided no evidence in connection with this question.

7.   The court takes judicial notice of this fact. *See* Fed. R. Evid. 201.